AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
January 21, 2022
CENTRAL DISTRICT OF CALIFORNIA
BY:    VM    DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
1/21/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ____JB____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.    2:22-mj-00281-DUTY |
| RICHARD ROYDEN CHAMBERLIN, | |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 7, 2021, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

|  Code Section  |  Offense Description  |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Cody Bescript, FBI Special Agent
Complainant's signature

Cody Bescript, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     January 21, 2022

Judge's signature

City and state:   Los Angeles, California

Hon. Michael R. Wilner, U.S. Magistrate Judge
Printed name and title

AUSA:   Frances S. Lewis (x4850)

## AFFIDAVIT

I, Cody Bescript, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against RICHARD ROYDEN CHAMBERLIN ("CHAMBERLIN") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.    This affidavit is also made in support of an application for warrants to search 696 ½ East Pine Street, Altadena, California 91001 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1, the person of CHAMBERLIN, as described more fully in Attachment A-2, and a Chevrolet Malibu with license plate 8MDT546 registered to CHAMBERLIN, as described more fully in Attachment A-3, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 241 (conspiracy against rights); 18 U.S.C. § 245 (interference with federally protected activities); 18 U.S.C. § 248 (freedom of access to clinic entrances); 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 922(g)(1) (prohibited person in possession of a firearm) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since August 2020. Currently, I am assigned to a Civil Rights squad, which investigates civil rights violations, including hate crimes, deprivation of rights under color of law, and violations of the Freedom of Access to Clinic Entrances Act ("FACE Act").  At the FBI Academy in Quantico, Virginia, I received 21 weeks of formal training, including training on firearms and firearms violations.  After graduating from the FBI Academy, I rotated through several different squads to gain experience about various types of investigations conducted by the FBI.

5.    During the time I have been employed with the FBI, I have participated in investigations relating to public corruption, hate crimes, terroristic threats, money laundering, counterintelligence, and color of law violations.  As such, I am familiar with and have employed numerous investigative techniques, including but not limited to physical surveillance and counter-surveillance, execution of search and arrest warrants, court-authorized interception of wire, oral, and electronic communication, serving and returning Federal Grand

Jury subpoenas, working with confidential sources, cooperating
with victims and witnesses, liaising with other agencies,
compiling database information, and utilizing other classified
tools.  Through the training and experience I have gathered, in
addition to my interaction with other law enforcement officers,
I am conversant with the methods of, and motivations for civil
rights investigations as they pertain to hate crimes, color of
law and FACE Act violations.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.   On multiple occasions in 2020 and 2021, the Planned
Parenthood Pasadena and San Gabriel Valley ("Planned
Parenthood") reported being fired upon with a suspected BB gun
by the occupant(s) of a moving car.  Planned Parenthood's video
surveillance from several of these attacks showed a blue-gray
Chevrolet Malibu with license plate 8MDT546 (the "Malibu")
registered to RICHARD CHAMBERLIN driving by with the passenger
window rolled down around the same time that the audio from the
surveillance reflects a popping sound resembling shots being
fired from a BB gun.  During one of these shootings on March 30,
2021, a patient's support companion was nearly hit as she waited
on the front porch.  In addition to incurring the costs of
repairs and added security, Planned Parenthood has had to cancel
patient appointments and the staff has been emotionally
traumatized not knowing when the next shooting will occur.

7.   On May 7, 2021, after another suspected BB gun attack,
Planned Parenthood called the Pasadena Police Department
("Pasadena PD"), which initiated a stop of the Malibu at an

intersection a few miles away.  CHAMBERLIN was the driver and sole occupant of the car.  During a search of the Malibu, officers found multiple BB guns as well as a backpack in the front passenger seat containing a .22 caliber handgun in a clear plastic bag.  In a Mirandized, recorded interview, CHAMBERLIN denied shooting at the Planned Parenthood, but claimed to be an investigative journalist with Project Veritas and admitted trying to create undercover videos in the past showing that Planned Parenthood sold baby parts.  CHAMBERLIN also initially denied that there were any "real" guns in his car, only BB guns, but when confronted about the real firearm in the backpack, CHAMBERLIN whispered "oh fuck" and then admitted that he had it "for protection."  He also admitted he had a prior felony conviction.

## IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports and recordings, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   Planned Parenthood Experiences Multiple Suspected BB Gun Attacks Between June 2020 and May 2021

9.   On or about the early afternoon of June 27, 2020, several windows of the Planned Parenthood were damaged by a suspected projectile.  Employees of Planned Parenthood reported the incident to the Pasadena PD, but according to the police report, Planned Parenthood's video cameras were not functioning during the incident.

10.   A month later, on or about July 27, 2020, another window of the Planned Parenthood was shattered, and employees of the Planned Parenthood again reported the incident to the Pasadena PD.

11.   On August 12, 2020, a third incident occurred where a window was shattered again, triggering an alarm.  This time, Planned Parenthood's video surveillance system captured a blue-gray Chevrolet Malibu driving by with the passenger window rolled down at approximately 7:58 a.m., around the same time that the audio from one camera reflects a popping sound consistent with shots being fired by a BB gun and audio from a second camera reflects an alarm ringing.

12.   The fourth incident occurred on or about March 29, 2021, at approximately 8:52 a.m.  Upon watching the surveillance video, Planned Parenthood's security officer, Stephen Mendoza, again saw a dark blue Chevrolet Malibu heading southbound on North Lake Avenue around the time of more popping sounds on the footage.

13.   The following day, on March 30, 2021, Planned Parenthood experienced an additional shooting by the occupant(s) of the Malibu.[1]  Surveillance video reflects that at 8:31 a.m.,

---

[1] My previous affidavit described two additional shootings on March 30, 2021: one at 8:30 a.m. and another at 8:31 a.m. This statement was based on my review of a declaration of Planned Parenthood's security specialist, Stephen Mendoza, which stated: "On Tuesday, March 30, 2021, the shooter fired at Pasadena Health Center at 8:30 am.  The health center had already opened for business when the shooting occurred.  The shooting was captured on our video cameras.  At 8:31 am, the individual did another drive-by."  I have since confirmed with *(footnote cont'd on next page)*

the Malibu drove by with the windows down and with shots audibly fired.  According to Mendoza's declaration, the BB gun shots narrowly missed hitting a woman who was sitting on a bench on the front porch of the facility.  Mendoza identified the license plate number for the Malibu as reflected in the video surveillance as 8MDT546 and reported the incident to the Pasadena PD.

14.   According to records from the Department of Motor Vehicles ("DMV"), a Chevrolet Malibu bearing license plate 8MDT546 is registered to CHAMBERLIN.

15.   According to Mendoza, six more BB gun shooting incidents happened in rapid succession on April 9, April 10, April 11, April 15, April 25, and May 2, 2021.  According to Mendoza, the surveillance footage for these incidents showed the same Malibu driving southbound on North Lake Avenue in front of the Planned Parenthood.  Additionally, the footage from at least two of these prior occasions (April 11 and April 25, 2021) depicted a female passenger inside the car, sitting in the front passenger seat.  To me, the existence of a passenger during these drive-by shootings on at least two occasions suggests CHAMBERLIN may have a co-conspirator as part of this conduct.

16.   During the incident on April 15, 2021, Mendoza was again on his way into work and was able to follow the car. Mendoza confirmed the same license plate number of the Chevrolet

---

Mendoza that this was just one shooting and that the first sentence was meant to be an approximation of the time of the incident, and the phrase "another drive-by" was referring to another shooting generally, not a second shooting the same day within a minute of the first shooting.

Malibu, 8MDT546, and captured the suspect's face on another recording.  While grainy, the person driving the Malibu in Mendoza's video resembles CHAMBERLIN.

17.  The Pasadena PD prepared a "wanted" flyer depicting a photograph of the Malibu and CHAMBERLIN's face, which it distributed to law enforcement on April 22, 2021.

**B.  On May 7, 2021, After Yet Another BB Gun Attack, CHAMBERLIN Is Arrested Driving the Malibu**

18.  According to Mendoza, on May 7, 2021, the Planned Parenthood experienced yet another BB gun attack.  Mendoza heard the shots being fired and immediately called the police, providing them with a description of the Malibu, including its license plate, the fact that he suspected the driver had (again) fired BB guns at the Planned Parenthood, and the direction he suspected the Malibu was traveling.

19.  Based on my review of the Pasadena PD reports and the available body camera footage, a few minutes after receiving the call from Mendoza, two motorcycle units identified the Malibu driving eastbound on the 210 freeway in the area identified by Mendoza.  Officer Anderson, who was driving a marked patrol vehicle, joined the motorcycles and initiated a traffic stop of the Malibu based on the 911 call.  The vehicle was pulled over on Corson Street, west of Altadena Drive.

20.  As captured by his body worn camera footage, which I reviewed, Officer Anderson approached the driver side of the Malibu, which was solely occupied by the driver, who identified himself as CHAMBERLIN and provided his driver's license.

CHAMBERLIN was asked to exit the car, handcuffed, and put into Officer Anderson's police vehicle, Unit 29.

21. CHAMBERLIN was placed under arrest while in the rear passenger seat of Officer Anderson's patrol car. Officer Anderson read CHAMBERLIN his Miranda rights while handcuffed in the back of the patrol car. When asked if he understood, CHAMBERLIN said "yes."

22. Meanwhile, Pasadena PD Officers McFarland and Arteaga arrived with Mendoza to conduct a field show-up. CHAMBERLIN was asked to step out of the patrol car while still in handcuffs, and Mendoza, who was seated in the rear of a different patrol car, identified CHAMBERLIN as the driver of the Malibu he had seen on previous occasions with "80% certainty."

23. CHAMBERLIN was returned to the rear of the patrol car. Multiple members of the Pasadena PD conducted a search of his car and immediately found what appeared to be a BB gun under the driver's seat.

24. When the search of the Malibu concluded, CHAMBERLIN was advised of the impounding process for his vehicle, and then transported to the Pasadena PD for booking.

25. According to the Pasadena PD reports, during the search of the Malibu, the Pasadena PD located eight BB guns, one of which was on the floor underneath the driver's seat. The Pasadena PD also located a live firearm, specifically, a model HP22 Phoenix Arms .22 caliber semi-automatic handgun bearing serial number 4203784 (the "Phoenix Arms handgun") in a clear plastic bag inside of a backpack on the front passenger seat.

The Phoenix Arms handgun was loaded with a magazine containing ten .22 caliber rounds.

26.   CHAMBERLIN was arrested and charged with several misdemeanor violations of the California Penal Code ("CPC"), including negligent discharge of a BB gun in violation of CPC § 246.3(b).  CHAMBERLIN was released on bail on the following day, May 8, 2021.  He made his first court appearance on October 28, 2021, and is scheduled to appear again on January 24, 2022.

**C.   After Being Advised of His Miranda Rights, CHAMBERLIN Denied Shooting at Planned Parenthood But Indicated Animosity Toward the Organization and Admitted Possessing the Firearm**

27.   CHAMBERLIN was initially interviewed by Officer Anderson during his arrest while seated in the back of the patrol car.  Officer Anderson first advised CHAMBERLIN of his Miranda rights, and CHAMBERLIN stated that he understood these rights.  When asked why a BB gun was found under the driver's seat of the Malibu, CHAMBERLIN explained that he teaches firearm safety and uses BB guns as teaching tools.  When asked why a teacher would store a BB gun under his car seat, CHAMBERLIN said that he lost track of it because he has so many BB guns and did not know there was one under the front seat.  CHAMBERLIN proclaimed to be a part of the YouTube show, "Wild West BB Test," in which BB guns are tested.

28.   CHAMBERLIN told Officer Anderson that all the BB guns belonged to him, but said that there were no "real" guns.  When asked why he was in the area at the time of the incident reported by Planned Parenthood, CHAMBERLIN stated that he had

recently dropped off his girlfriend's child at a Japanese language school and was heading to a friend's house to help him install a pool. CHAMBERLIN was confronted by Officer Anderson with the reports of BB gun shootings that occurred at the Planned Parenthood location, and CHAMBERLIN denied being involved or even knowing where the Pasadena Planned Parenthood was located.  CHAMBERLIN explained to Officer Anderson that he had investigated Planned Parenthood in 2013 with a colleague, whom he identified as David Daleiden ("Daleiden").[2]  CHAMBERLIN said that he was undercover investigator for "Project Veritas."[3] CHAMBERLIN also stated that he was being targeted by Kamala Harris because of his investigation into Planned Parenthood. CHAMBERLIN was then transported to the Pasadena PD jail while the remaining officers completed their search of the Malibu.

29.  Officer McFarland arrived at the Pasadena PD jail to relieve Officer Anderson and complete the booking of CHAMBERLIN

---

[2] According to open-source database searches, Daleiden has previously accused Planned Parenthood of selling aborted fetal baby parts and taken undercover videos of a Planned Parenthood doctor in an attempt to prove this.  After this incident, four Congresspeople, including Representatives Jan Schakowsky, Zoe Lofgren, Jerry Nadler, and Yvette Clarke wrote to both Attorney General Loretta Lynch and California Attorney General Kamala Harris, asking them to open investigations into the Daleiden's non-profit organization, called "The Center for Medical Progress."

[3] Project Veritas's website indicates that their mission is to expose corruption, dishonesty, and other misconduct for the benefit of the citizens of the United States.  The founder, James O'Keefe, has publicly admitted to Project Veritas editing their videos to skew the truth and misrepresent recorded events, according to Project Veritas' website. Similarly, open-source database searches indicate that closer examinations of videos posted by Live Action were found to have used deceptive editing to make false claims, ending in the discrediting of Live Action.

into custody.  Officer McFarland read CHAMBERLIN his <u>Miranda</u>
rights again, but CHAMBERLIN indicated he already received them.
CHAMBERLIN again said that he was an investigative journalist
with Project Veritas.  CHAMBERLIN described Project Veritas as
people who wear hidden cameras and go into places to get them to
speak about their crimes. CHAMBERLIN accused Planned Parenthood
of "taking whole babies and selling baby body parts," but denied
knowing where the Pasadena Planned Parenthood was located and
denied shooting at it with a BB gun.  After being told that he
was seen on video shooting a BB gun at the building, CHAMBERLIN
asked to see the video and added, after a brief silence, "at
least the baby murderers have somebody on their side."

     30.  Officer McFarland then confronted CHAMBERLIN about
having a loaded firearm in the car, which CHAMBERLIN initially
denied.  After being told that a ".22 caliber pistol" was found
in a bag, CHAMBERLIN whispered "oh fuck," and then said the gun
was "for protection."  CHAMBERLIN said that he did not have a
concealed carry permit for the weapon.  CHAMBERLIN disclosed
that he had been convicted of a felony in the past and asked
whether he could still be considered a felon if he had completed
his time.  The Pasadena PD, however, was unable to find a prior
felony upon their initial review of CHAMBERLIN's criminal
history.

     31.  I have reviewed publicly available videos on YouTube,
and identified a video titled "Make The Call – Series Break Down
(with a little ranting)," which was posted to a YouTube channel
titled "Make the Call."  The video features a person I recognize

to be CHAMBERLIN, based on my review of his DMV photograph and body worn camera footage from his arrest on May 7, 2021.  In the video, CHAMBERLIN made the statement, "Stop aborting babies and selling their body parts."  CHAMBERLIN's name and nickname of "RC" are visible in the subtitles of the video as CHAMBERLIN is speaking.

      **D.**    **The BB Gun Attacks Have Interfered with the Operations of Planned Parenthood**

32.  Many of the BB gun incidents described above occurred during business hours when staff and clients were present.  The video surveillance captures sound from the incidents, which include sounds resembling an automatic BB gun.

33.  In response to these sustained and random attacks, Mendoza informed me that Planned Parenthood has undergone repairs and upgrades to the building, including its locks and security cameras.

34.  On July 2, 2021, interviews were conducted by the FBI with three employees of Planned Parenthood: E.D., V.R., and J.M. Each interviewee independently stated to the interviewing Agents that the arrest of CHAMBERLIN and the additional security measures have not eased the distress of themselves and other staff members.  E.D. and J.M. reported that other colleagues have called in sick due to the stress and fear caused by the attacks.

35.  According to J.M., on Wednesday, May 12, 2021, the staff found out that CHAMBERLIN had been arrested with a real gun found in his possession but was released from jail.  J.M.

said that this resulted in an estimated two employees calling in sick each day on the following Thursday, Friday, and Saturday, in addition to walk-in appointments not being taken for approximately 10 days afterward.  J.M. stated that the reduction in staff capacity due to the numerous employee sick call-outs caused a loss of patient care.

36.  J.M. also reported that Planned Parenthood's annual Active Shooter Training was delayed because of the belief that the staff was too traumatized by the recent events.  E.D. and V.R. both stated in their interviews with the FBI that they have contemplated quitting their jobs at Planned Parenthood.  J.M. stated that one male employee quit because these incidents had triggered his Post-Traumatic Stress Disorder.

37.  According to E.D., a counselor was brought in to speak with the staff, which concluded with a consensus of the staff fearing that CHAMBERLIN will come back to enact further shootings. J.M. separately stated that many staff members still did not feel comfortable coming into work despite the therapist being brought in. J.M. relayed that the staff was worried that CHAMBERLIN would use a real gun next time.  J.M. recounted that she was opening her blinds at the time of one attack and believed she could have been seriously injured if a real weapon had been used rather than a BB gun, or if the windows had not been upgraded to Plexiglas.

38.  On May 24, 2021, CHAMBERLIN was served a temporary protection order in person by a private investigator from Paul Bonin and Associates, Incorporated.  The order mandates for

CHAMBERLIN to stay away from the Planned Parenthood location and four specific employees.  The private investigator also interviewed CHAMBERLIN after serving the legal documents. According to Bonin's report, CHAMBERLIN explained to the private investigator that CHAMBERLIN believes he has discovered evidence proving that Planned Parenthood engages in illegal activity in connection with abortions.  CHAMBERLIN then mentioned that he is aware he may not get back the handgun the police seized from him, but he is less concerned about not getting the handgun back from the Pasadena PD than he would be about his other firearms if they were seized.

**E.    CHAMBERLIN Is a Convicted Felon and Is Not Authorized to Possess Firearms, But Has Several Registered to Him**

39.  According to records from the Superior Court of the State of Arizona, Navajo County, CHAMBERLIN was convicted in the Superior Court of the State of Arizona, Navajo County, on November 5, 2012, in Case No. S0900CR201100907 with attempted transportation of a narcotic drug for sale in violation of Arizona Revised Statute §§ 13-1001, 13-3408(A)(7), 13-3408(B)(7), 13-3408(D), 13-3401, 13-701, 13-702, and 13-801, a felony crime punishable by a term of imprisonment exceeding one year, for which CHAMBERLIN was sentenced to a period of 12 days' custody and a three-year period of probation.  Conviction records show that CHAMBERLIN was advised that his conviction was classified as a felony offense.

40.  A law enforcement database check for firearms registered to CHAMBERLIN in California returned that he has

14

owned a total of nine firearms, all of which were acquired before his conviction, including six semi-automatic pistols, one shotgun, a bolt-action rifle, and a semi-automatic rifle. Specifically, the following nine firearms are currently registered to CHAMBERLIN:

     a.   A Phoenix Arms semi-automatic pistol with serial number 4258375;

     b.   A Smith and Wesson semi-automatic pistol with serial number PBM3465;

     c.   A Bryco Arms semi-automatic pistol with serial number 1067170;

     d.   A Jennings Firearms semi-automatic pistol with serial number 1375165;

     e.   A Lorcin Engineering semi-automatic pistol with serial number 2408;

     f.   A Hi-Point semi-automatic pistol with serial number P202549;

     g.   A Soviet Union bolt action rifle with serial number BD8746;

     h.   An Amadeo Rossi & Co. shotgun with serial number S12SP047165; and

     i.   A Marlin Firearms semi-automatic rifle with serial number 12369520.

    41. The Phoenix Arms handgun recovered from CHAMBERLIN's person on May 7, 2021, is not registered in California. Records from the Bureau of Alcohol, Firearms, and Tobacco show that a person named "Richard Chamberlain" with the same date of birth

15

and approximate physical description as CHAMBERLIN acquired the handgun from a firearms dealer in Cedar City, Utah, on July 22, 2002.  CHAMBERLIN did not register this firearm within 60 days upon moving to California, as required by California Penal Code §§ 17000 and 27650.

42.   On May 19, 2021, Planned Parenthood filed for and received a restraining order against CHAMBERLIN, which states that CHAMBERLIN is prohibited from possessing and/or purchasing a firearm, and that he must surrender, sell, or store them with a licensed gun dealer and show proof of these actions in court. According to information received from Planned Parenthood, on June 3, 2021, CHAMBERLIN surrendered only four firearms to Lock Stock and Barrel Investments Incorporated: (1) the Hi-Point semi-automatic pistol; (2) the Soviet Union bolt action rifle; (3) the Amadeo Rossi & Co. shotgun; and (4) the Marlin Firearms semi-automatic rifle.  The whereabouts of the first five semi-automatic pistols identified above that are registered to CHAMBERLIN remain unknown.

**F.   Interstate Nexus**

43.   On January 11, 2022, FBI Special Agent Trevor Twitchell examined the Phoenix Arms handgun and found that the handgun was manufactured in the State of California.  However, Agent Twitchell confirmed that the Phoenix Arms handgun was purchased by CHAMBERLIN in the state of Utah on July 22, 2002, and thereafter found in California.  He therefore believes that the Phoenix Arms handgun has traveled in and affected interstate commerce.

44.   Additionally, Agent Twitchell examined the 10 rounds of ammunition recovered from inside the loaded Phoenix Arms handgun in CHAMBERLIN's car on May 7, 2021.  Agent Twitchell concluded that these rounds were manufactured by Federal Cartridge Company in either Idaho, Minnesota, or Missouri, and therefore must have traveled in and affected interstate commerce because they were found in California.

   **G.   Investigation of the SUBJECT PREMISES**

45.   According to the DMV, CHAMBERLIN's registered address is on Gray Pine Court in San Bernardino, California 92407.  I and other FBI agents have conducted surveillance at this address on multiple occasions, however, and have not seen any evidence that CHAMBERLIN lives or spends any time at this address in San Bernardino, California.  Instead, we have identified cars associated with other individuals at this address.

46.   On October 13, 2021, the Honorable Jacqueline Chooljian, United States Magistrate Judge for the Central District of California, issued a warrant for historical and prospective cell-site and GPS information for a telephone associated with CHAMBERLIN in Case No. 21-MJ-41699.  A continued warrant was obtained on November 29, 2021, and again on January 12, 2022, from the Honorable Karen L. Stevenson, United States Magistrate Judge for the Central District of California.

47.   According to the GPS information I have reviewed about the whereabouts of CHAMBERLIN's cell phone, I have seen no evidence of CHAMBERLIN residing at the Gray Pine Court address in San Bernardino, California.  Instead, from the GPS data and

17

other sources, I have learned that CHAMBERLIN appears to live at the SUBJECT PREMISES in Altadena, California.  I believe this for the following reasons:

       a.   CHAMBERLIN's financial records, including records associated with a Paypal account in his name, show multiple transfers to a woman named M.H., whose registered address with the DMV is the SUBJECT PREMISES.  The SUBJECT PREMISES is a unit within a small complex called the "Alpine Apartments" on Pine Street in Altadena, California.

       b.   CHAMBERLIN's cell phone has received a signal at night, for the duration of the night, and in the mornings, of a majority of the nights between November 2021 and January 2022 in the vicinity of the SUBJECT PREMISES.

       c.   On January 13, 2022, I conducted physical surveillance at the SUBJECT PREMISES and saw CHAMBERLIN and a woman appearing to be M.H. from her DMV photographs at the same apartment complex as the SUBJECT PREMISES, as well as both of their cars, the Malibu registered to CHAMBERLIN and a Ford with license plate number 6KLD378, registered to M.H. at the SUBJECT PREMISES.

    48.  Cell-site data also showed CHAMBERLIN's telephone frequently returning to a storage unit provider called Price Self Storage in the area of Rancho Cucamonga.  Physical surveillance and license plate reader information confirmed that the Malibu had driven by this storage facility in the area, and the manager confirmed that CHAMBERLIN was a customer.

49.   On January 7, 2022, I learned that CHAMBERLIN vacated his remaining storage unit at Price Self Storage the day before. GPS data confirmed that CHAMBERLIN was last present at the storage facility on January 6, 2022, after which point he returned to the Altadena area near the SUBJECT PREMISES.

50.   Even after vacating his storage facility on January 6, 2022, CHAMBERLIN's cell phone location indicates that he stayed overnight at the SUBJECT PREMISES that same night, as well as most recently on the night of January 17, 2022, into the morning of January 18, 2022.

### V.   TRAINING AND EXPERIENCE ON CIVIL RIGHTS VIOLATIONS

51.   From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who investigate civil rights and bias-motivated offenses, I am aware of the following

a.   Individuals who commit civil rights or bias-motivated offenses, or who conspire with others to commit crimes based on shared bias or ideology, often have in their digital devices photographs, communications, notes, or other electronic records that discuss their motivations for committing crimes or contain evidence of bias, such as animus towards people based on gender or their participation in federal services or benefits.

b.   Individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology use cell phones, other electronic devices, e-mail, and social media to conduct their illegal activities, to preserve and distribute photographs and videos in order to

memorialize previous illegal activity and advance their social
and ideological agenda, and to maintain contact with other
confederates, conspirators, and criminal associates involved
with the planning, targeting, and execution of their
goals.  These goals can include, espousing violence, making
threats online, recruiting like-minded individuals to their
activities, and committing acts of violence that target
individuals who are seen as anathema to their shared ideology or
social agenda.

       c.   Individuals who commit civil rights or bias-
motivated offenses, or who conspire with others to commit crimes
based on shared bias or ideology, use various symbols, slogans,
and paraphernalia that they often maintain in their digital
devices.  Such individuals will also use banners, flags, and
posters to publicly advertise their social and ideological goals
and/or to use as a recruitment tool.  Evidence of these items is
often maintained in the individuals' homes, in their vehicles,
on their person, and/or on their digital devices.

### VI. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

52.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

       a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical

control, such in their digital devices or in their car.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.     Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

53.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

54.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus,

23

often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

56.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHAMBERLIN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CHAMBERLIN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature

57.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VIII.    <u>CONCLUSION</u>

58.  For all of the reasons described above, there is probable cause to believe that CHAMBERLIN has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of

//

//

the premises described in Attachment A-1, the person described
in Attachment A-2, and the car described in Attachment A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __21__ day of
_January_ , 2021.

_____
MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE